## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |  |
|---|---|---|
| IN RE BELLSOUTH CORPORATION SECURITIES LITIGATION | ) ) ) ) ) ) | Civil Action No. 1:02-cv-2142-WSD CLASS ACTION |

## LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR LIMITED RECONSIDERATION

### INTRODUCTION

Under the guise of a Motion for Limited Reconsideration ("Def. MLR" or "MLR"), Defendants seek to present new arguments that they failed to raise in their initial motion papers, including their Reply Brief. Having failed in the previously filed Motion to Dismiss, ("MTD"), Defendants' new motion simply revisits the facts previously cited and repackages the same arguments previously advanced in the MTD. Moreover, Defendants have provided this Court with no reason to find that clear error exists in the Court's February 8, 2005 Order (the "Order"). At bottom, the error cited is the Court's disagreement with the arguments Defendants made in the MTD.

Defendants' challenge to the Court's Order is directed at Plaintiffs' claim that Defendants failed to timely write-down the Company's goodwill in connection with its Latin American operations.  As a result, Plaintiffs' claim BellSouth materially overstated its goodwill and reported earnings, rendering its financial statements and statements regarding the Company's financial condition materially false and misleading.

In the Order, the Court found that Plaintiffs had "adequately alleged a material misstatement or omission with regards to BellSouth's Latin American goodwill."  Order at 42.  Further, the Court held that

> "[t]he timing and scope [of Defendants' insider] sales, the company's assurances regarding impairment reviews being conducted when circumstances warrant them, the decision not to offer the tracking stock, the significance and circumstances of the restatement and its timing, raise a sufficient inference that Defendants acted with scienter when making the misstatements and omissions alleged".

Order at 71-72.

Defendants now belatedly argue that the write-down of Latin American goodwill was immaterial and that the percentage of insider sales of the Individual Defendants undercuts any inference of scienter in connection with Plaintiffs' Latin American goodwill claim.

As a pretext for their scienter argument, Defendants contend that new intervening authority handed down by the 11th Circuit after briefing was complete,

*Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017-18 (11th Cir. 2004),

mandates that the Court revisit the scienter issue and analyze scienter with respect

to each Defendant and with respect to each violation.  Yet, Defendants ignore that

this is precisely the analysis that the Court undertook in holding that the timing and

scope of Defendants' insider trading, along with other facts alleged regarding

events in Latin America and the restatement raised a strong inference that

Defendants acted with the requisite scienter.  Indeed, this Court relied on

*Scientific-Atlanta* in the Order:

> Furthermore, under the PSLRA, a securities fraud complaint must "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  Although factual allegations may be aggregated to infer scienter, "scienter must be found with respect to each defendant and with respect to each alleged violation." *See Phillips v. Scientific Atlanta, Inc.*, 374, F.3d 1015, 1017-18 (11th Cir. 2004).

Order at 54.

Notwithstanding the fact that there has been no new intervening authority to

cause the Court to revisit the scienter issue, Defendants contend that the percentage

of insider sales of the Individual Defendants negates any inference of scienter.  The

thrust of Defendants' argument is that Plaintiffs inflated the magnitude of insider

stock sales by not including vested stock options.  Although this argument has

always been available to Defendants, they have raised it for the first time in their MLR.

Even assuming Defendants' method of calculating the percentage of insider sales is correct, which Plaintiffs do not concede, a review of the Court's Order demonstrates that the Court emphasized the suspicious timing of the insider trading in reaching its conclusion that Defendants acted with scienter.  Order at 71. Moreover, when one compares the Individual Defendants' sales of BellSouth stock for the three years prior to the start of the Class Period on November 7, 2000, with their sales during the Class Period, determining whether Defendants' insider sales were suspicious in both timing and scope becomes a non-issue.

For example, Defendant Dykes sold 133,336 shares of his BellSouth stock during the Class Period, reaping proceeds of over $5.3 million.  Yet, in the three years preceding the Class Period Defendant Dykes sold only 12,621 shares of his BellSouth stock receiving proceeds of a little over $638,000.  *See Chitwood Declaration at Exhibit B*.  Thus, during the Class Period, Dykes' sales were over ten times what they were in the three years preceding the Class Period.

Defendant Shannon's insider trading during the Class Period is equally suspicious.  During the Class Period, Defendant Shannon sold 22,007 shares of BellSouth stock, reaping proceeds of over $910,000.  For the three years preceding the Class Period, Defendant Shannon sold only 778 shares for proceeds of

approximately $29,000.  *Id*.  The most suspicious of all however, is Defendant Ackerman, who sold 107,676 shares of BellSouth stock during the Class Period (reaping proceeds of over $4.3 million), and none in the three years prior to the Class Period.  *Id*.  When viewed in its proper context, the Individual Defendants' insider trading was both suspicious in timing and scope.

Finally, Defendants contend that the failure to write-down goodwill related to BellSouth's Latin American operations was immaterial.  Defendants' argument is based on the assertion that only about $277 million of the over $1.2 billion write-down was attributable to Defendants' misconduct.  Defendants claim the remainder of approximately $1 billion was due to the adoption of FAS 142.  Defendants are wrong.

As argued below, drawing all reasonable inferences in favor of Plaintiff as the Court should on a motion to dismiss, the write-down of goodwill attributable to Defendants' misconduct was approximately $944 million.  Furthermore, the Court recognized that the parties disputed the amount of the write-down due to Defendants' fraud when it found that Plaintiffs' "estimate that the impairment of goodwill not related to the change in accounting was **at least** $277 million."  Order at 41, n.19 (emphasis added).

Moreover, in the two days following BellSouth's public announcement of the $1.277 billion write-down of Latin American goodwill, a bad debt expense of

$255 million and a loss of $0.01 in earnings per share due to Supra's non-payment, BellSouth stock fell from $27.61 to $21.30 per share, a drop of 22.9% on substantially increased trading volume.  Complaint ¶ 111.  This significant drop in BellSouth's stock price and increase in trading activity in the two days following the negative announcement demonstrates materiality.  *In re Miller Indus. Inc. Sec. Litig.*, 12 F.Supp. 2d 1323, 1326 (N.D.Ga. 1998) (a significant drop in share price and increase in trading activity over the days following a negative announcement frequently indicates materiality).  Indeed, even assuming the $277 million figure is correct, determining whether and what the amount of the drop in stock price attributable to the Defendants' failure to timely write-down goodwill is a question that should be left to the fact finder. *Miller* at 1329 (materiality is a mixed question of law and fact).  At this juncture of the case, Plaintiffs have properly alleged a material misstatement or omission.

Defendants have failed to present any sustainable legal grounds to justify reconsideration of these issues by the Court.  Thus, Defendants' MLR should be denied in its entirety.

## ARGUMENT

### I.   Legal Standard for Motions for Reconsideration.

Under Local Rule 7.2E of the Northern District of Georgia ("LR 7.2E"),

motions for reconsideration shall not be filed as a matter of routine practice." LR

7.2E.  "[T]raditionally, motions for reconsideration are to be filed only when

'*absolutely necessary*'."  *Hornor, Townsend, & Kent, Inc., v. Hamilton*, 2003 WL

2284503 at *3 (N.D. Ga. 2004) (Emphasis added.)  In *Hornor*, the Court found that

"reconsideration is only absolutely necessary where there is: '(1) newly discovered

evidence; (2) an intervening development or change in controlling law; or (3) a

need to correct a clear error of law or fact.'"  *Id.,* at *3.  *See also Bryan v. Murphy*,

246 F.Supp. 2d 1256, 1258 (N.D. Ga. 2003).

A motion for reconsideration is inappropriate where, like here, Defendants

have offered new legal theories or evidence that could have been presented in

conjunction with the previously filed motion or response.  *Bryan*, 246. F.Supp. 2d

at 1259, citing *Alder v. Wallace Computer Servs., Inc.*, 202 F.R.D. 666, 675 (N.D.

Ga. 2001). [1]  As discussed below, Defendants have failed to satisfy any prong of

the three-pronged test enumerated in *Hornor*, 2003 WL 23832424 at *3.

---

[1]    A motion for reconsideration cannot be used as an opportunity to instruct the court on
how it could have ruled better the first time.  *Kerr v. McDonald's Corp.*, 333 F. Supp. 2d 1352,
1353 (N.D.Ga. 2004).  Nor can a motion for reconsideration be used to "present the court with
arguments already heard and dismissed or to repackage familiar arguments to test whether the

**A.      Defendants Have Failed to Establish that Reconsideration of the Order is "Absolutely Necessary."**

**1.      Defendants Have Not Presented Any "Newly Discovered Evidence."**

In their MLR, Defendants raise, for the very first time, the argument that "[P]laintiffs inflated the magnitude of insider stock sales during the purported class period by using calculations specifically rejected by numerous Circuit Courts of Appeals."  Def. MLR at 2.  In support of their argument, Defendants attach eight exhibits to their MLR, all of which were either published, or publicly filed, *before* this case began.  All of the facts regarding the Individual Defendants' insider trading, including their sales as a percentage of vested options, were publicly-filed and known to the Defendants at the time they filed their MTD.  Consequently, the facts discussed in the MLR are hardly "new evidence."

Clearly, the MTD presented Defendants with the appropriate opportunity and forum in which to raise this argument.  Defendants should not be permitted two bites of the apple because it made the strategic decision not to introduce this evidence.

Indeed, Defendants admit that they declined in both in their MTD and the Reply Brief to present this evidence.  Defendants concede that they "did not

---

court will change its mind."  *Bryan*, 246 F. Supp. 2d at 1259, citing *Pres. Endangered Areas of Cobb's History, Inc.*, 916 F. Supp. 1557, 1560 (N.D.Ga. 1995).

undertake to determine whether the percentages quoted in Plaintiffs' brief were accurate." Def. MLR. at 4, n. 2.   Defendants do not offer this Court an explanation as to why they did not determine whether the percentages quoted in Plaintiffs' brief were accurate or why they failed to present the information earlier. When the moving party does not provides a sufficient explanation for its failure to present the information earlier, the motion for reconsideration should be denied. *Spacey v. Burgar*, 207 F.Supp.2d 1037, 1051-1054 (C.D.Cal. 2001); *see also Barber v. Hawaii*, 42 F.3d 1185, 1198 (9th Cir.1994) (holding a district court did not abuse its discretion in denying a request for reconsideration of a summary judgment motion because the moving party presented no reason why the newly proffered affidavits could not have been obtained prior to the court's hearing on the summary judgment motion); *Taylor v. Texgas Corp.*, 831 F.2d 255, 259 (11th Cir. 1987)("Unexcused failure to produce the relevant evidence at the original trial can be sufficient, without more, to warrant denial of a motion [for reconsideration].")

Because Defendants have not presented any new or previously unknown facts or evidence, Defendants should not be able to ask this Court to reconsider issues already decided in the Order.

**2.    Defendants Do Not Cite Any "Intervening Authority" to Justify Reconsideration.**

9

In their MLR, Defendants claim that "in light of the new intervening authority and the miscalculation described above, this Court should undertake such an analysis." Def. MLR at 7.  This argument lacks merit and borders on frivolous. As noted in the Introduction, supra, this argument can be quickly disposed of by a reading of the Court's Order at p.54, where the Court cites the "new and intervening authority", *Phillips v. Scientific Atlanta*, 374 F.3d 1015 (11th Cir. 2004) and undertakes to analyze scienter "with respect to each defendant and with respect to each violation" *Id* at 1017-18.  The Court then proceeds to analyze insider trading individually with respect to each Defendant, as the Defendants now urge.  See Order pp. 70-72, including explicit detailed analysis in footnotes 27 and 28.  As demonstrated, there is no new intervening authority mandating the Court to revisit its finding on scienter.  The Court has already performed the appropriate analysis consistent with the 11th Circuit's decision in *Scientific-Atlanta*.  Thus, Defendants have not cited any intervening changes in controlling law that would warrant reconsideration.

### 3.     The Court Did Not Make An Error of Law or Fact.

In its Order, the Court determined that Plaintiffs' allegations demonstrated that Defendants' stock sales, coupled with (1) the timing and scope of these sales; (2) the facts alleged regarding events in Latin America; (3) the company's assurances regarding impairment reviews being conducted when circumstances

warrant them; (4) the decision not to offer the tracking stock; and (5) the

significance and circumstances of the restatement and its timing, were unusual,

suspicious and probative of strong inference of scienter.

In their MLR, Defendants claim that there was "a crucial mistake of fact

supplied by Plaintiffs" which, they assert, "the Court apparently relied on in

concluding that Plaintiffs had sufficiently pled an Exchange Act claim arising from

the write down of Latin American goodwill." MLR at 1.  Defendants claim

Plaintiffs' calculations of the percentage of holdings each insider sold were

"mistaken" because they did not take into account vested stock options.  *Id.*

Despite Defendants' claims, however, there was no "crucial mistake" in

calculating the insider trading.  Rather, the only "crucial mistake" is Defendants'

failure to make this argument in their earlier motions.  Further, Defendants

themselves supply the Court with a crucial mistake by including *unexercisable*

"out-of-the-money" stock options in their percentage calculations, as discussed

below.  In doing so, Defendants significantly understate the percentage of holdings

sold Dykes, Coe and Shannon.

Moreover, the Court's reasoning that the Plaintiffs pled scienter with the

requisite particularity was based primarily on the suspicious timing of the insider

sales.   The Court did not analyze the insider sales on a percentage basis, and

therefore made no significant error.  Therefore, the Court properly weighed the

evidence before it when deciding the Order, and made no mistake of fact or law in reaching its decision.

**II.   Even If Defendants Had Satisfied the Legal Standards for Reconsideration as Required by LR 7.2E, Defendants' Motion is Without Merit and Must be Denied.**

**A.   The Individual Defendants' Class Period Trading Was Unusual and Suspicious and Supports the Court's Finding of a Strong Inference of Scienter.**

In its Order, this Court held that Plaintiffs pled sufficient facts regarding the Individual Defendants' sales of BellSouth common stock that supported the strong inference of scienter.  Plaintiffs sufficiently alleged that the Individual Defendants sales were not only suspiciously large in size but suspiciously timed between the release and the implementation of FAS 142.  As the Court stated in the Order:

> Plaintiffs' argument appears to be that Defendant Dykes, Anderson, Coe and Ackerman were aware of the deteriorating conditions in Latin America, that these circumstances necessarily were eroding the company's goodwill in the region and should have triggered a review for impairment, and in anticipation of having to disclose a significant restatement of this goodwill, they sold significant shares of the stock in the several months before FAS 142 went into effect and before the restatement was made.  The timing and scope of these sales, the facts alleged regarding events in Latin America, the company's assurances regarding impairment reviews being conducted when circumstances warrant them, the decision not to offer the tracking stock, the significance and circumstances of the restatement and its timing, raise a sufficient inference that Defendants acted with scienter when making the misstatements

> and omissions alleged.  *See, e.g., In re AFC Enters., Inc., Sec. Litig.*, 348 F. Supp. 1363, 1375 (N.D.Ga 2004).

Order at 71-72.[2]   Defendants now challenge this Court's decision by claiming that the insider trading was "artificially inflated" because the Court did not consider the Individual Defendants *unexercisable* vested stock options when analyzing the scope of insider trading.[3]

In performing their analysis of the percentage of insider trading, Defendants have included "out-of-the-money" stock options, which the Individual Defendants could not have exercised or sold.  According to Defendants, once the vested stock options are taken into account, the percentages of stock the Individual Defendants disposed of during the Class Period shrinks to a "figure so benign it negates any inference of scienter."  MLR at 5.   In support of their argument, Defendants cite a number of cases supporting the proposition that vested stock options should be considered when analyzing the scope of insider trading.[4]

---

[2]     It should be noted that Defendant Coe is not being charged with a violation of Section 10(b) of the 1934 Act, nor Rule 10b-5 and therefore, his scienter is not at issue.  Indeed, the only insider trading relevant to the issue of scienter is that of the named Individual Defendants.  *See Campbell v. Lexmark International, Inc.*, 234 F.Supp.2d 680, 685 (E.D. Ken. 2002); *Plevy v. Haggerty*, 38 F.Supp.2d 816, 834 (C.D. Cal. 1998).

[3]     At the time they filed the MTD, Defendants did not present any evidence regarding the Individual Defendants' vested stock options.  Thus, there is no discussion in the Court's analysis of the percentage of holdings sold by any insider.

[4]     Defendants' reliance on these cases is misplaced.  For example, in *Acito v. Imcera Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995), the court found that the sale of stock by *one* outside director did not give rise to a strong inference of an intent to deceive the investing public.  Moreover,

Several courts, however, have held that stock options should not be considered when evaluating insider trading because options **are not shares**.  *In re Oxford Health Plans, Inc*. 187 F.R.D. 133, 140 (S.D.N.Y.).  In *Oxford Health,* the court held that:

> "[D]efendants include in their calculation of 'holdings' vested options and shares gained by exercising options that were about to expire and otherwise would have been lost.  First, vested options are not shares.  Second, without more information, this Court cannot evaluate the true value of the options exercised by the Individual Defendants.  They may have exercised options to buy at a very low price per share, in which case the shares

---

unlike here, the court noted that the complaint had failed to allege that any other defendant sold any shares of the company's stock during the class period.  Further, the 30,000 shares sold by the one outside director were stock options that became exercisable subsequent to the negative press release.

In *In re Healthsouth Corp. Sec. Litig.*, No. CV-98-J-2634-S, 2000 WL 34211319, at * 41 (N.D. Al. Dec. 13, 2000), although the defendants options are used to determine the percentage of share sold, the court held that the timing of the sales and the circumstances of the individual defendants are also considered to determine whether a strong inference of scienter is present.  The court further noted that "even if [it] found that the options were not relevant, it would not have changed the ultimate result [. . .] premised on a lack of specificity in the allegations."  2000 WL 34211319, at * 41 n.44.

In *Campbell v. Lexmark Int'l, Inc.*, 234 F. Supp. 2d 680 (E.D. Ky. 2002), the court held that defendant's stock sales appeared "reasonable in light of impending expiration of many of his stock options."  Further, unlike here, the court found that the defendant had engaged in a regular pattern of stock sale activity that obliterated any inference of scienter.

In *In re Credit Acceptance Corp., Sec. Litig.*, 50 F. Supp. 2d 662, 677 (E.D. Mich. 1999), although the court noted that options should be considered in evaluating the percentage of a defendant's holdings, the court emphasized that a stock sale is considered suspicious and unusual when it is out of line with prior trading practices and sold at a time calculated to maximize personal benefit from undisclosed information.  Here, even if the court were to consider the "in-the-money" options for purposes of determining the percentage of defendants' holdings, defendants' prior trading practices and time of sales raises a strong inference of scienter.

> would have been valuable to the defendants even after the stock plummeted.  Finally, 'retention of a large position in [the company] and . . . pre-announcement purchases [do not] vitiate insider trading liability . . .  [where the defendant] realized a profit of over $2 million from his pre-announcement transaction.'"

187 F.R.D. at 140.  *See also*, *Zishka v. American Pad & Paper Co.,* No. 3:98-CV-0660-M, 2000 WL 1310529* 2 n.3 (N.D. Tex. Sept. 13, 2000)(rejecting the Defendants' request to consider options in calculating the percentage of holdings.)

Even if the Court accepts Defendants' "new evidence" and considers the stock options as part of the Individual Defendants total holdings, this is only one of several factors to consider when determining whether the insider trading was unusual or suspicious.  In determining whether the insider trading is "unusual or suspicious", the court may consider a number of different factors.  *See, e.g., In re HealthSouth Corp. Sec. Litig.*, 200 WL 34211319 * 38 (N.D. Ala. 2000).  In *HealthSouth,* the court noted three relevant factors:  (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history.  2000 WL 34211319 at *38, citing *In re Silicon Graphics*, 183 F.3d 970, 986 (9th Cir. 1999).

Furthermore, several courts have held that the percentage of shares sold is less relevant than the timing of the sales and the pre-class period sales.  *See, e.g., In*

*re Secure Computing Corp*., 184 F. Supp. 2d 980, 990 (N.D. Cal. 2001) (finding

support for the inference of deliberate recklessness in timing of insider sales

without regard to percentage; court noted that "what is unique and suspicious about

these sales is not the percentage of shares sold compared to total holdings, but

rather that no defendant had ever before sold any [company] stock . . . ."); *see also*

*Stevelman v. Alias Research Inc.,* 174 F.3d 79, 85-86 (2d Cir. 1999) (holding stock

sales unusual and suspicious based upon timing, not percentage of holdings sold).

Indeed, in a case heavily cited by Defendants, *Silicon Graphics*, the court held that

"insider trading is suspicious only when it is "dramatically out of line with prior

trading practices at times calculated to maximize the personal benefit from

undisclosed inside information." 183 F.3d at 986.

      **1.**    **The Timing, Scope and Minimal Pre-Class Period Sales of Dykes Are Unusual and Suspicious.**

Defendants assert that Dykes sold only 17.5% of his total holdings.  This

assertion is incorrect.  In November 2001, Defendant Dykes sold 126,468 shares of

BellSouth stock for proceeds of over $5 million.  Defendant Dykes engaged in this

selling before the Company disclosed to the public the consequences of FAS 142

for its already impaired Latin America assets: a $1.277 billion write down in Latin

America goodwill. Defendant Dykes also sold 6,868 shares in April 2001, for

proceeds of approximately $290,000.  Thus, Defendant Dykes sold 133, 336 shares during the Class Period, reaping proceeds of over $5.3 million.

As this Court has already held, the significant amount and timing of these trades is "suspicious enough," along with the other facts, to support a strong inference of scienter.  *See In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999); *Simon v. Am. Power Conversion Corp.*, 945 F. Supp. 416, 435 (D.R.I. 1996) (trades made two months before a negative public announcement sufficiently suspicious in timing to raise a strong inference of scienter); *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 656 (8th Cir. 2001) ("trading at a particular time is circumstantial evidence that the insider knew the best time to trade because he or she had inside information not shares by the public.").  Although Defendant Dykes exercised "in the money" options during the months of April and November of 2001, his total percentage sold during the Class Period was 28.14%.  This percentage is a far cry from Defendants' assertion of 17.5% .[5]

Further, Defendants failed to bring to the Court's attention that Defendant Dykes had a huge amount of shares vesting during the Class Period.  In short,

---

[5]      Other courts have found insider trades suspicious in amount where the defendant sold for far less profit.  *See, e.g., Rubinstein v. Collins*, 20 F.3d 160, 169 (5th Cir. 1994 ($760,599); *Marksman Partners LP v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal. 1996) (twenty percent of holdings sold for $6.3 million).

premature disclosure of the release and the implementation of FAS 142 would have rendered the options worthless because the options would have been under water (*i.e.*, the exercised price of the options would have been higher than the market value of the underlying securities).

Moreover, in the three years before the Class Period (*see* Chitwood Declaration at Exhibit B) Defendant Dykes sold only *12,621* shares of BellSouth common stock.  This is a stark contrast from his Class Period sales of 133,336 shares, which raises a strong inference of scienter.  *See In re Sensormatic Elec. Corp. Sec. Litig.*, No. 018346, 2002 WL 1352427, at *7 (S.D. Fla. June 10, 2002) (insider stock sales "out of line" with pre-class period stock sales provides a strong inference of scienter); *see also In re Spyglass, Inc. Sec. Litig.*, Mo. 99 C 512, 1999 WL 543197, at *6 (N.D. Ill. July 21, 1999); *In re Peritus Software Servs., Inc.*, 52 F. Supp. 211, 224 (D. Mass. 1999).

### 2.    The Timing, Scope and Minimal Pre-Class Period Sales of Shannon Are Unusual and Suspicious.

Defendants assert that Shannon sold only 5.6% of his total holdings.  This assertion is also incorrect.  Once again, in performing their analysis, Defendants counted "out-of-the-money" options, which Shannon could not have exercised or sold.

In 2001, Defendant Shannon sold 20,000 shares for proceeds of $860,000. This sale represents (including exercised in-the-money options) 20.67% of his total holdings.[6]  Defendant Shannon engaged in this selling before the Company disclosed to the public the consequences of FAS 142 for its already impaired Latin America assets.  Once again, the timing of these trades is "suspicious enough," along with the other facts, to support a strong inference of scienter.

Moreover, a review of SEC filings reveals that Defendant Shannon sold only *778* shares of BellSouth common stock during the three years prior to the Class Period.  Defendant Shannon's pre-class period sales are tiny in comparison to his Class Period sales of 22,007 shares.  This supports the Court's finding of a strong inference of scienter.

### 3. The Timing, Scope and Lack of Ackerman's Pre-Class Period Sales Are Unusual and Suspicious.

Although Defendant Ackerman sold a relatively small percentage of his shares and vested options, this percentage is a function of the very large number of options vesting[7] during the Class Period, and not an indication that the amount of

---

[6]     In total Defendant Shannon sold 22,007 shares during the Class Period, reaping proceeds of over $910,000.

[7]     On January 3, 2002, Defendant Ackerman exercised 96,276 shares of vested options for a total of $1,250,405, and on January 4, 2002, 11,400 shares of vested option options for $154,755.

shares he sold was small.[8]  In January 2002, the effective month of the goodwill write-down, and approximately 6 months before BellSouth's July 22, 2002 disclosure of the Latin America goodwill write-off, Defendant Ackerman sold a total of 107,676 shares for proceeds of over $4.3 million.  This is by any reckoning a significant sale of shares for enormous proceeds.  Defendant Ackerman engaged in this selling before the Company disclosed to the public the consequences of FAS 142 for its already impaired Latin America assets.  Once again, the timing of these trades is unusual and suspicious and supports the Court's finding of a strong inference of scienter.

But perhaps the most suspicious fact about Ackerman's Class Period sales is the comparison with his pre-Class Period sales.  Ackerman sold *no shares* of BellSouth common stock in the three years prior to the Class Period.  The fact that Ackerman did not sell any shares of BellSouth common stock pre-class period and sold 107,676 shares during the Class Period right before the Company disclosed to the public the $1.277 billion write-down in Latin America goodwill, is unusual and suspicious and clearly supports the Court's finding of a strong inference of scienter.

---

[8]      In fact, the vesting of a large amount of options can indicate a motive and opportunity to commit fraud since Ackerman would have wanted to conceal the FAS 121 impairment as long as possible and mask the impairment write off as a function of the discounting process required by FAS 142.

**B.     Defendants' Assertions Concerning Goodwill Are Without Merit and Must be Denied.**

**1.     Defendants Misconstrue Plaintiffs' Analysis Presented at Footnote 10, Page 12 of Plaintiffs' Opposition Brief to Defendants' Motion to Dismiss.**

In their motion, Defendants present the recycled argument that "the Court should take into account Plaintiffs' concession that approximately *$1 billion* of the July 2002 write down resulted from the change in accounting principles and that only about $277 (*sic*) million was allegedly attributable to a reduction in value of the assets that should have been taken under FAS 121."  MLR at 12. (Emphasis in original.)[9]

This is an erroneous assertion.  Plaintiffs never conceded that "only about $277 (*sic*) million" was the actual impairment value as asserted by Defendants in the MLR.  Instead, as explained in Plaintiffs' Opposition Brief to Defendants' Motion to Dismiss ("Pl. Opp. MTD"), at 12, n. 10, Plaintiffs calculated, "*conservative[ly]*," that the impairment was "*at least*" (*i.e.,* no less than) $277 (*sic*) million.[10]  Pl. Opp. MTD at 13, n. 10.(Emphasis added.)

---

[9]     Defendants previously, and unsuccessfully, made this argument in their Reply Brief at 7.

[10]     Plaintiffs bring the Court's attention to a typographical error, in Pl. Opp. MTD, at 12, n. 10.  Plaintiffs' calculation actually results in a conservative estimate of the minimum amount of impairment of $2*47* million (*i.e.,* $365 less $118 as stated at Pl. Opp. MTD, at 13, n. 10 (cont'd.)), and not $277 million.  From this point forward, Plaintiffs will refer to the correct amount, or $2*47* million as it was intended to be in Pl. Opp. MTD.

Using conservative assumptions, Plaintiffs calculated that, under FAS 142's discounting requirements, $365 million represented the discounted value of the FAS 121 (pre-impairment) Latin America goodwill of $1,395 million in existence at December 31, 2001. Defendants reported in 2002 that actual (and hence, unimpaired) FAS 142 discounted goodwill was only $118 million. Therefore, under the FAS 142 discounted basis, $247 million ($365 million – $118 million) represented goodwill impairment that was *not* a result of the change in accounting principle from FAS 121 to FAS 142. *See* Pl. Opp. MTD at 13, n. 10 (cont'd.). Therefore, according to Plaintiffs' assumptions, approximately 67.7% ($247/$365) of the FAS 142 discounted goodwill in existence at December 31, 2001 is *not* accounted for by the change in accounting principle (*i.e.*, discounting process) from FAS 121 to FAS 142. Plaintiffs' assumptions thus provide a strong inference that approximately 67.7% (or $944 million) of the $1,395 million FAS 121 undiscounted goodwill in existence at December 31, 2001 had been impaired on that date and was *unrelated* to the goodwill write-off that would be necessary pursuant to the change in accounting principle from FAS 121 to FAS 142.

Further, Plaintiffs' analysis at ¶ 186 of the Consolidated and Amended Class Action Complaint (the "Complaint") clearly shows that since the end of 1998, Defendants' Latin America goodwill actually *grew* by a total of $912 million. This growth occurred during the years where, as Defendants admit, they "told the

market about the difficulties the Latin American business was experiencing."

(Def. MLR at 12.)  Plaintiffs contend that Defendants' fraud was their *failure to*

*recognize* the goodwill impairment *in spite of* their public acknowledgement of the

conditions in Latin America (Complaint ¶ 185) and the violation of their own

"FAS 121-type Policy."  *See* Complaint ¶¶ 244-252.

> ## 2.  BellSouth's Latin America Goodwill Impairment Was Material to Investors.

Defendants also argue that the amount of the write down clearly attributable

to BellSouth's failure to conduct an impairment analysis under FAS 121 is not

material.  Defendants misrepresent Plaintiffs' arguments concerning the write-

down of Latin America goodwill in their attempt to rehash old arguments from

their MTD.  Defendants, once again, improperly use the MLR to recycle a

previously made argument that was rejected by the Court.  (*See*, Reply Brief at 7-

8.)  As discussed more fully below, these arguments are also without merit.

Defendants also argue that "$277 (*sic*) million is but a fraction of

BellSouth's $52,046,000,000 total assets as of December 31, 2001."  (Def. MLR at

12.)  Plaintiffs' allegations provide a strong inference of the materiality of

Defendants' $1.277 billion write-down in Latin America goodwill to investors in

the Company's common stock.  Materiality is an objective measure based on the

"reasonable investor" or "reasonable shareholder" standard.  *See Rudd v. Suburban*

*Lodges of America, Inc.,* 67 F.Supp. 2d 1366, 1373 (N.D. Ga. 1999), citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976).

Indeed, this write-down was material to investors in BellSouth's common stock. For instance, on July 22, 2002, BellSouth announced that it would be recording a goodwill impairment loss of $1.277 billion. Complaint ¶ 179. On July 19, 2002, the previous trading day, BellSouth's common stock closed at $27.61[11] on volume of 5,250,300 shares. On July 22, 2002, the date of the announcement, BellSouth's common stock lost $5.00 (or 18.1%) of its value to close at $22.61, on volume of 18,127,000 shares, representing a 245.3% increase in trading activity. The next trading day, July 23, 2002, BellSouth's common stock continued to lose its value by an additional $1.31 (or 5.1% decrease) closing at $21.30 on trading volume of 14,415,200 shares. Thus, between July 19, 2002, the trading day before BellSouth's announcement of the $1.277 billion Latin America goodwill impairment write-off, and July 23, 2002, the day following the announcement, the Company's stock price declined in value by $6.31, or 22.9%, a very material amount. (Pl. Opp. MTD at 32.)

Once again, the numbers speak for themselves. Defendants' $1.277 billion reduction in Latin American goodwill represented a "*92% decrease*" in that asset.

---

[11]     All stock prices quoted herein are unadjusted for dividends and splits.

Pl. Opp. MTD at 11. (Emphasis in orginial).  This amount is prima facie material and Defendants' arguments are without merit and should be dismissed.

## CONCLUSION

Defendants have failed to prove that reconsideration is "absolutely necessary" pursuant to LR 7.2E.  In the instant case, this Court recognized the well-established principle that "the Court on a motion to dismiss must still view all allegations in the light most favorable to the plaintiffs."  (Order at 55).  Plaintiffs contend that the Court's decision was proper based on all the facts, evidence, and allegations presented to it during the motion to dismiss phase of this litigation.

Therefore, Plaintiffs respectfully request that this Court deny Defendants' unsubstantiated Motion for Limited Reconsideration and leave the Order undisturbed.

**DATED:**  March 14, 2005

Respectfully submitted,

**CHITWOOD & HARLEY, LLP**


 **/s/ Martin D. Chitwood**
Martin D. Chitwood
Georgia Bar No. 124950
Krissi T. Gore
Georgia Bar No. 687020
1230 Peachtree Street NE
2300 Promenade II
Atlanta, GA 30309

25

Telephone:  (404) 873-3900
Fax:  (404) 876-4476

**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**
Keith M Fleischman
Francis P. Karam
Andrea H. Williams
10 East 40th Street
New York, NY 10016
Telephone:  (212) 779-1414
Fax:  (212) 779-3218

**Co-Lead Counsel for Plaintiffs**